Argued and submitted October 11, 2016, affirmed March 22, 2017

In the Matter of D. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. M.,
*Appellant.*

Lake County Circuit Court
16JU00789; A162035

392 P3d 820

Foster A. Glass argued the cause and filed the brief for appellant.

Robert M. Wilsey, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Sercombe, Presiding Judge, and Flynn, Judge, and DeHoog, Judge.

## DEHOOG, J.

In this juvenile dependency case, father appeals the judgment assuming jurisdiction over his child, D, pursuant to ORS 419B.100(1)(c). The juvenile court took jurisdiction based on its determination that D's conditions or circumstances endangered his welfare because (1) mother placed D under a threat of harm by exposing him to domestic violence in the home; (2) mother failed to engage in services offered to her to help ensure D's safety and continued to allow contact between father and D despite father's impulsive and dangerous behavior; and (3) father exposed D to domestic violence, placing D at a threat of harm. On appeal, father raises five assignments of error. He challenges all three bases for the court's jurisdiction over D, arguing that there is insufficient evidence to establish jurisdiction, and also asserts that the court erred in admitting hearsay testimony from the Department of Human Services (DHS) caseworker.[1] For the reasons explained below, we affirm.

Father does not request *de novo* review, and this is not an exceptional case warranting such review. *See* ORAP 5.40(8)(c) (we exercise our discretion to review *de novo* only in exceptional cases). Accordingly, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). Specifically, we

"(1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the

---

[1] In his fourth assignment of error, father asserts that the juvenile court erred in failing to include in the amended judgment a dismissal of the allegations in paragraph 8F of the petition even though the transcript of the proceeding reflects such a dismissal by the court. However, the juvenile court signed a corrected amended judgment on August 16, 2016, dismissing the allegations in paragraph 8F. That assignment of error is therefore moot, and we do not address it further.

court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied."

*Id.* at 639-40. We state the relevant facts in accordance with that standard.

Father and mother have one child together, D; mother also has a daughter, K, who is not related to father.[2] At the time of the jurisdictional hearing, D was four years old, and K was 14. In January 2016, father, mother, D, and K all lived in the same home.

On January 16, 2016, father came home in the evening, found the door locked, and yelled to be let inside. Mother unlocked the door, and father entered, tackled mother to the floor, and began to choke her with both hands. The struggle lasted for approximately 20 to 30 seconds. After mother asked K for help and K said that she was going to call the police, father jumped up and knocked her cell phone away. Mother stood up and tried to get between father and K. Father pushed K away, hitting her in the face in the process; K, in turn, swung at father and struck him in the face.[3] D was present but asleep in a recliner in the room where the incident took place. Albertson, a 19-year-old friend of K, witnessed the incident. After that altercation, K left the house with Albertson and stayed with him at his parents' home that evening. Father and mother were arguing when Albertson and K left.

That same evening, DHS caseworker Estes, a second DHS caseworker, and police officers spoke with mother outside of the residence. Father and D remained inside, and mother refused to allow the caseworkers or police to enter the home. After about an hour of talking, mother agreed to go into the home, get D, and stay with him at a motel for the night. After they arrived at the motel, Estes spoke to mother about a safety plan. Estes asked mother not to allow contact

---

[2] Mother is not a party to this appeal.

[3] The exact sequence of the physical interaction between father and K is not clear from the record.

between the children and father, causing mother to become very upset. Mother refused to sign a written safety plan providing for no contact between the children and father, but eventually gave Estes her verbal assurance that she would not allow that contact. Mother also agreed to meet at a shelter on the following day.

Although mother met with Estes's coworker and a person from the shelter to finalize a safety plan, mother did not keep father away from D as she agreed to do at that meeting. Mother also did not immediately return phone calls from DHS. When mother ultimately called DHS, she left a voice message stating that she was back in the family home and that the children were at D's grandparents' house. After receiving community reports that the children had, instead, been seen at their own house when father was home, DHS attempted—again unsuccessfully—to contact mother. DHS was concerned that mother's decisions were placing the children at risk and, therefore, sought court authorization for DHS to take the children into protective custody. The court signed an order authorizing protective custody on January 27, 2016. DHS found D at home with both father and mother and immediately removed him from their care. At that time, police officers were also at the home to arrest father on a warrant.

On January 29, the juvenile court held a shelter hearing and granted temporary custody of D to DHS. DHS placed D in nonrelative foster care along with his half-sister, K. DHS petitioned for jurisdiction over D, alleging the following bases:

"A. The mother's *** substance abuse hinders her ability to adequately and appropriately parent and protect her child and places the child under a threat of harm.

"B. The mother *** has placed her child under a threat of harm by exposing the child to domestic violence in the home.

"C. The mother *** has failed to engage in services offered to her to help ensure the safety of the child. [Mother] continues to allow contact between the father *** and the child, despite his impulsive and dangerous behavior.

"D. The mother * * * suffers from Mental Health conditions that hinder her ability to safe[l]y parent the child placing the child under a threat of harm.

"E. The father * * * has exposed the child to domestic violence, placing the child at a threat of harm.

"F. The father * * * has a history of violence and impulsive behavior and a pattern of domestic violence while children are present. This places the child under a t[h]reat of harm.

"G. The father * * * has addictive behaviors regarding gambling and alcohol abuse which hinders his ability to safe[l]y parent the child. This places the child under a threat of harm."

The juvenile court held a jurisdictional hearing on March 2, approximately six and a half weeks after the physical altercation between father and mother in mid-January. The court heard from a number of witnesses, including mother; Albertson, who had witnessed the January 16 incident; Estes, the DHS caseworker; and others. DHS presented testimony regarding both the incident and father and mother's ongoing fighting.

Mother admitted that she and father have arguments that sometimes become very heated and that their relationship has been stormy over the past year. Mother also testified that she had been attempting to save money so that she could get a train ticket and leave father. Mother stated, "I have had thoughts and plans of getting away because, you know, to make things better for us." She also said that she had some funds set aside to remove herself and the kids if she and father could not work things out—"to get [her] kids into a healthy, non-fighting environment." On the weekend of the January 16 incident, mother did not have access to her car because father had given it to his employees for their use. She testified that if she had had the car, she "would have loved to have left that weekend."

Mother was not the only person to testify about the arguments she had with father. D's paternal grandmother testified that mother and father fight and "yell at each other," but denied that it was often. A neighbor also testified that she had heard mother and father argue before.

Estes testified that, before the January 16 incident, she had personally done multiple assessments on the family regarding domestic violence and substance abuse; those reports, however, were deemed unfounded or "unable to determine." Estes also had spoken with father about his relationship with mother, and she testified that father blamed himself for the tension and fighting in the home and that he took "responsibility for the fighting and the incident that had happened that night[.]"

Estes also testified that, in her view, the threat of harm to D from the January incident was "significant," and explained that "[t]he parents were not in their right state of mind to take considerations of their children's safety, one child had to leave the home, the 4-year-old didn't have that option." Estes also stated that "[t]he physical risk that children are in during domestic violence is that they can be in the middle" and that "[D] would be at risk of harm. He was physically present, he could have been harmed, and that is the risk to the child." Estes further testified without objection that K had told her that, when father pushed her, she was pushed into the recliner where her brother was sleeping.[4]

At the conclusion of the hearing, the court informed the parties of its decision without providing a detailed explanation. The court took jurisdiction over the child on the domestic violence-related allegations of the petition stating, "I will take jurisdiction on 8(B), the mom and domestic violence; (C), mom failed to engage in services; and (E) father and domestic violence." Father's first three assignments of error challenge that ruling.

Under ORS 419B.100(1)(c), jurisdiction is appropriate "when a child's condition or circumstances endanger the welfare of the child." *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 61, 308 P3d 307 (2013). A child's welfare is endangered if he is exposed "to conditions or circumstances that present a current threat of serious loss or injury." *Id.* The "key inquiry in determining whether conditions or circumstances warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of

---

[4] Father assigns error to the admission of K's statement as hearsay; however, that argument is unpreserved and therefore we do not consider it.

harm to the welfare of the child." *Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010) (internal quotation marks and brackets omitted). In addition, "DHS has the burden to prove that there is a nexus connecting the parent's allegedly risk-causing conduct and the harm to the child and also that the risk of harm is present at the time of the hearing and not merely speculative." *Dept. of Human Services v. K. V.*, 276 Or App 782, 791, 369 P3d 1231, *rev den*, 359 Or 667 (2016) (internal quotation marks omitted).

We begin with father's first and third assignments of error, in which he asserts that the court erred in taking jurisdiction over D on the bases contained in paragraphs 8(B) and 8(E) of the petition: Mother and father exposed D to domestic violence, placing him under a threat of harm.[5] As we understand it, father's argument on appeal is that the evidence does not support a finding that D actually witnessed violence between his parents because the testimony presented at the jurisdictional hearing was that D was asleep and undisturbed by father's behavior on January 16. As a result, father contends, there is no credible evidence that D was ever exposed to a display of domestic violence and, correspondingly, no evidence of current risk of harm to D.[6]

---

[5] As noted above, mother has not appealed. Nonetheless, father assigns error to the court taking jurisdiction over D on the bases that mother (1) exposed D to domestic violence and (2) failed to engage in services and continued to allow contact between father and D. He contends that it is appropriate for him to appeal those jurisdictional bases under our decisions in *Dept. of Human Services v. E. M.*, 264 Or App 76, 331 P3d 1054 (2014), and *Dept. of Human Services v. W. A. C.*, 263 Or App 382, 328 P3d 769 (2014). Although DHS disputes father's contention that those decisions allow him to appeal the jurisdictional findings regarding mother, DHS does not object to our consideration of the sufficiency of the court's findings pertaining to mother to the extent that father preserved a challenge to them. DHS accepts that it is appropriate to do so where, as here, the findings pertaining to a child's exposure to domestic violence by each of his parents are "necessarily intertwined" with one another. We agree. *See Dept. of Human Services v. S. P.*, 249 Or App 76, 86, 275 P3d 979 (2012) (where court's findings as to mother were dependent, in part, on the soundness of its findings as to father, mother could challenge all of the jurisdictional findings on appeal, including those pertaining to father).

[6] Given that father does not dispute our standard of review, we do not consider his assertion that there is no "credible" evidence of that fact to suggest that we should weigh the evidence anew. Instead, consistent with the standard articulated above, we consider only whether there is any evidence to support the juvenile court's express and implicit findings of fact, including its finding that D was "exposed" to domestic violence.

In response, DHS argues that the fact that D was asleep throughout the incident does not mean that D was not exposed to domestic violence; DHS further contends that D's exposure to domestic violence created a reasonable likelihood of harm to him. We agree with DHS, and conclude that DHS presented sufficient evidence from which the juvenile court could find that father and mother exposed D to domestic violence and that that exposure endangered him. We further conclude that those findings support the court's ultimate determination that there exists a current risk of harm to D.

First, having taken jurisdiction on the basis of the domestic violence allegations in the petition, the juvenile court implicitly found that domestic violence had occurred, and there is evidence in the record to support that finding. Albertson, who was an eyewitness to the January 16 incident, testified that father had tackled mother to the floor and put both hands around her throat and choked her, and that mother had asked for help from her 14-year-old daughter, K. Albertson also testified that father had knocked a cell phone from K's hands, pushed her away from him, and struck her in the face.

Second, there is sufficient evidence to support the court's implicit finding that D was exposed to that domestic violence. As noted, DHS argues that a child does not have to be awake to be "exposed" to domestic violence. DHS contends that "exposed," as alleged in the petition, should be given its ordinary meaning. Citing *Webster's Third New Int'l Dictionary* 802 (unabridged ed 2002), DHS contends that "exposed" simply means "not shielded or protected : so situated as to invite or make likely an attack, injury, or other adverse development." We see no reason to give any different meaning to the term. And, in this case, there was no evidence that anyone shielded or otherwise protected D from the domestic violence unfolding around him. Although there was testimony by those present that D slept through that violence, there is no dispute that D was in a chaotic and physically threatening environment. The incident involved father tackling mother and choking her, striking K, knocking K's cell phone out of her hand and across the room, and shoving her into the recliner where D slept. That evidence

readily supports the juvenile court's finding that D was exposed to domestic violence by his physical presence.

Third, there is evidence to support the court's implicit determination that there was a nexus between the exposure to domestic violence on that occasion and a risk of harm to D in general. Estes testified that, in her view, the threat of harm to children is significant whenever they are present for domestic violence. Specifically to this case, she stated that "[t]he parents were not in their right state of mind to take considerations of their children's safety" and that "[D] would be at risk of harm. He was physically present, he could have been harmed, and that is the risk to the child." As we have just explained, there is sufficient evidence to support the court's determination that D was put at risk by the events immediately surrounding him even though he was not physically harmed or even aware of those events. *See Dept. of Human Services v. C. F.*, 258 Or App 50, 55, 308 P3d 344, *rev den*, 354 Or 386 (2013) (court took jurisdiction over children because they were residing under a threat of harm due to incidents of domestic violence that occurred in their presence); *State v. S. T. S.*, 236 Or App 646, 655-56, 238 P3d 53 (2010) (testimony that, "when there is physical violence in the home, a child may suffer an inadvertent injury" was evidentiary support for the court's determination that violence between the parents created a risk of harm to the children's welfare).

Further, to the extent that father contends that, because there was only a single episode of domestic violence in this case, the juvenile court could not find a current threat of harm, we disagree. The altercation on January 16 not only posed an immediate threat to D's safety, it also provided grounds for the juvenile court to determine whether D's circumstances in general put him at a risk for harm. There was evidence that father attacked mother without any apparent regard for the emotional or psychological impacts that his behavior might have on D.[7] Father also engaged in violent behavior toward K, who is herself a child and D's half-

---

[7] Father does not suggest that he relied on the happenstance that D was asleep at the time to protect D from the nonphysical consequences of domestic violence.

sibling. In doing so, he prevented her from taking steps—calling the police—to restore safety to the family home. And father concluded the altercation by shoving K, a teenager, into the recliner where four-year-old D slept, unprotected. That evidence was sufficient to support the juvenile court's determination that the domestic violence between father and mother endangered D's welfare both immediately and in general.

Finally, there is evidence in the record to support the court's implicit determination that the risk to D was current at the time of the jurisdictional hearing, which took place a little over six weeks after the domestic violence incident. Although mother had agreed to leave the home with D on the night of the incident, she returned to the home with him at some point thereafter, even though father was there. Mother also appeared to avoid DHS in the weeks after the incident, which, in light of mother's earlier reluctance to keep father away from her children, the court could view as evidence that she was unwilling to prioritize D's safety. And D was at home with mother and father when DHS picked him up to place him in shelter care just a little over a month before the jurisdictional hearing. There was no evidence presented at the hearing that either parent engaged in services or otherwise attempted to ameliorate their issues after the January 16 incident. Despite the past domestic violence—including violence directed at another child—and mother's apparent recognition that the threat of future violence was a threat to D's safety, she remained unable or unwilling to protect D from that harm.

We conclude that the juvenile court's implicit factual findings were legally sufficient to support its determination that exposure to domestic violence put D at risk of serious loss or injury. Accordingly, the court did not err in concluding that D's conditions or circumstances endangered him and properly took jurisdiction on the bases alleged in paragraphs 8(B) and 8(E) of the dependency petition.

We turn to father's second assignment of error, in which he contends that the juvenile court erred by asserting jurisdiction over D on the basis of allegation 8(C) of the petition: Mother failed to engage in services offered to help

her ensure the safety of D and continued to allow contact between father and D despite his impulsive and dangerous behavior. Father argues on appeal that, because the juvenile court had not yet taken jurisdiction when DHS offered services to mother, she was under no obligation at that point to accept their services. Thus, father reasons, her failure to do that cannot support a finding of jurisdiction.

DHS argues in response that father failed to preserve his second assignment of error. DHS asserts that father did not argue to the trial court (1) that DHS lacked the authority to require mother to engage in services or (2) that mother had not, in fact, failed to engage in services. The record reflects only that father argued that the evidence was insufficient to support a finding of jurisdiction—not that the jurisdictional allegations of paragraph 8(C) were legally insufficient. We therefore decline to consider father's second assignment of error. ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court."); *see also State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted.").

Finally, we address father's fifth assignment of error, in which he asserts that the juvenile court erred by not excluding hearsay testimony from the DHS caseworker regarding a statement that D reportedly made to the caseworker.[8]

Estes testified that, on the day she went to the residence to remove D and his half-sister, she asked D "if he was okay, what he thought about what was going on, and without really any prompting or any *** questions, he said [that] Mommy and Dad fight a lot and the police come." Father objected to the admission of D's statement, and the juvenile court overruled his objection. Father asserts on appeal that

---

[8] In that assignment of error, father also challenges the court's failure to exclude an out-of-court statement by K. However, as noted, that contention is unpreserved, and we do not address it.

it was erroneous for the court to admit D's statement. He argues that the statement was hearsay and was not admissible because it was not offered under OEC 803(4) (hearsay exception for statement made for purposes of medical diagnosis or treatment). Father also cites *Dept. of Human Services v. J. G.*, 258 Or App 118, 308 P3d 296 (2013) (stepchildren's out-of-court statements were properly admitted through doctor's in-court testimony and CARES evaluations as statements made for purposes of medical diagnosis or treatment in a juvenile dependency case), in support of his argument.

DHS asserts that father's argument is unpreserved, but also argues that, if we reach father's argument and conclude that the juvenile court erred, we should also conclude that the error was harmless because there is little likelihood that the statement affected the court's determination that D had been exposed to domestic violence. At most, according to DHS, the child's statement was cumulative of other evidence of his exposure to domestic violence that supported the court's assertion of jurisdiction. DHS does not argue that D's statement was not hearsay or that it was admissible pursuant to a hearsay exception.

From our review of the record, we conclude that father sufficiently raised an objection to the admission of D's hearsay statement to preserve it for our review, and we reject DHS's preservation argument without further discussion. We further conclude, however, that, even assuming that the court erred in admitting D's statement, that error was harmless. "Evidentiary error is considered harmless and is not a basis for reversal 'if there is little likelihood that the particular error affected the verdict.'" *Dept. of Human Services v. G. D. W.*, 353 Or 25, 39, 292 P3d 548 (2012) (quoting *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003)). Here, although D's out-of-court statement has some relevance to his exposure to domestic violence and fighting in the family home, it was cumulative of and qualitatively similar to other evidence presented at the hearing. Mother, D's grandmother, and a neighbor all testified that mother and father fight, and Estes testified that the police were at the family residence on at least two separate occasions. In addition, there was sufficient evidence aside from D's statement—the testimony

from Albertson and Estes—to support the juvenile court's determination that the exposure to domestic violence placed D at risk of physical harm. Thus, the challenged evidence was cumulative. We therefore conclude that there is little likelihood that the admission of the statement affected the outcome. *Cf. G. D. W.*, 353 Or at 40 (erroneously admitted out-of-court statements were important to juvenile court's ultimate decision on the allegations that father had sexually abused child, therefore error was not harmless).

Affirmed.