Argued and submitted August 14, affirmed November 7, 2012, petition for review denied March 28, 2013 (353 Or 428)

In the Matter of N. J. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. C. S.,
*Appellant.*

Lane County Circuit Court 11572J;
Petition Number 11572J01;
A150957

290 P3d 903

James A. Palmer argued the cause and filed the brief for appellant.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Hadlock, Judge, and You, Judge pro tempore.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

In this juvenile dependency case, mother appeals from a judgment of the juvenile court taking jurisdiction over mother's infant daughter, N, after finding that mother has a mental or emotional condition that puts N at risk. Mother contends that the court did not have jurisdiction over the case because she and N are both from Indiana and that, if the court did have jurisdiction, it erred in finding against mother on the facts. We affirm.

Mother grew up in Indiana, but most recently had lived for four years in Oregon while taking care of her ailing father. While in Oregon, she became pregnant and had prenatal care. The Department of Human Services (DHS) first came into contact with mother in April 2011, during her pregnancy, when her doctor reported that she had tested positive for methamphetamine use at a prenatal visit. In September 2011, mother returned to Indiana and gave birth to N. One month later, mother returned to Oregon with N in order to collect her belongings. She testified that it was her intention to then return to Indiana.

In November 2011, mother—still in Oregon—sought medical care for N based on her belief that N was allergic to milk-based formulas and was having seizures after consuming them. On November 18, mother took N to four health care providers and three area hospitals. She reported that N, after being fed, appeared to slip into a coma-like state and would "blow up." Medical personnel did not detect a problem.

On November 19, mother again sought medical attention for N, taking her to Doernbecher Children's Hospital at OHSU with the same concerns. She reported that the infant had seizures after consuming milk-based formulas, explaining that N would puff up and then get "a mean look on her face like she's going to come after me and eat my face." Mother explained that N would then sleep for hours and would not wake up for her next feeding. She reported to doctors that she was feeding N whole milk with a bit of Karo syrup and chamomile tea to calm her stomach.

According to hospital staff, the infant tolerated regular formula quite well. N weighed seven pounds,

11 ounces, and appeared to be healthy, but doctors admitted her for observation. However, mother became concerned when she noticed that hospital staff were feeding N a milk-based formula, rather than a soy-based formula. When hospital personnel persisted in feeding N a milk-based formula, mother took N out of the hospital, despite the fact that she had not been discharged. OHSU staff contacted DHS with concerns for N's nutritional health based on mother's reports of what she was feeding her. On November 21, 2011, a DHS caseworker went to mother's house and found her in her car. Mother reported that her sister had taken the infant to Indiana.

The caseworker attempted to locate N in Indiana to verify her safety. In fact, she subsequently determined that N was still in Oregon. Mother was receiving public assistance, and the caseworker put a hold on her benefits in order to induce her to come forward.

During a December 9, 2011, meeting with mother and N, the caseworker asked mother about her mental health and possible drug use. Mother denied using drugs, but stated that she had been diagnosed with ADHD and chronic anxiety and had been prescribed medications in Indiana. Mother explained that she was behaving erratically because she was concerned for N's health and was seeking medical treatment for N. The caseworker suggested that, in light of mother's prior methamphetamine use, she would conduct an assessment and ask mother to submit a urine sample.

During the meeting, mother made a telephone call to her mother in Indiana. In a conversation with family members on speaker phone, mother expressed concern that DHS was trying to take her infant. Family members urged her to bring N back to Indiana. The caseworker then told mother that, because of concerns that mother would run from an investigation, the state would take N into protective custody. Mother became agitated and a scuffle ensued, during which mother nearly dropped the infant and threatened to assault the caseworker. After N's removal, mother and family members made threatening telephone calls to DHS and threatened the DHS caseworker with physical violence.

The DHS caseworker subsequently obtained a stalking protective order against mother.

Mother attended regular supervised visitation with N, but routinely became angry and threatening with staff. At the first visit, she declined to bottle feed N, stating that she did not want to feed her poison.

DHS filed a petition for jurisdiction on December 9, 2011. The juvenile court in Lane County took jurisdiction under ORS 419B.100(1)(c),[1] based on "conditions or circumstances" such as to endanger N's welfare. Among other allegations, the petition alleged that mother suffers from a mental or emotional condition that interferes with her ability to parent and that, while suffering from a mental or emotional condition, she is unable or unwilling to provide N with care, guidance and supervision necessary for N's physical, mental, and emotional well being, placing N at risk. The court assumed jurisdiction, making these findings:

> "The Court does have to make some findings about mother's demeanor, and her manner in testifying today, and I really do that only because to really get a sense of mother's testimony it is something that is * * * much more helpful to understand the Court's ruling if one actually saw the mother's testimony.
>
> "And so I am going to make some credibility findings, but * * * I'm actually also making findings as to the court's assessment of mother's demeanor in testifying, and her way that she has explained some of the things that she has done immediately around the time that the child was removed, and then up to the date of the hearing.
>
> "And that is that * * * mother's testimony seems to be exaggerated and prone to emotional flourishes. Dismissals out of hand even when there has been testimony that in fact contradicts the things that mother is saying. As though by testifying with great emotion * * * that somehow would

_____

[1] Under ORS 419B.100, a juvenile court has jurisdiction "in any case involving a person who is under 18 years of age and:

"* * * * *

"(c) Whose condition or circumstances are such as to endanger the welfare of the person or of others[.]"

make the testimony more believable even when it is at * * * variance with the testimony of others.

"I * * * don't know what is happening, and that's not my job to figure out. [The allegation of the petition concerning the risk to the child posed by mother's mental and emotional health has] been demonstrated in part by what occurred up at * * * the children's hospital in Portland where mother left after seeking out what she believed was medical care for the child.

"That mother persists in thinking the people are trying to harm the child by giving the child formula which she apparently is by other reports responding to appropriately[.] And even * * * in a visit saying that she wouldn't feed the child because she thought that would be poisoning the child.

"You know, taking this entire picture together and filtering out the understandable anger, and fear, and distress at the removal of such a young child which is absolutely understandable, mother has kind of accelerated and expanded upon this in a way that clearly is not taking into account the child's best interest, and even declining to feed the child when having a chance to hold her child and feed her child. And this is just sort of a pattern that has developed over a period of 60 plus days in this case.

"There are a number of things that mother has been asked * * * to do on a voluntary basis that she's declined to do so, and I don't think that can be held against her, but it certainly can be part of this overall picture that she is more focused really now on what DHS has done to her, rather than focusing on what she needs to do so that she can safely parent this child."

Mother appeals, contending that the juvenile court lacked subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) and that it erred in concluding that N was at risk based on her condition or circumstances. There is no request for *de novo* review. For that reason, and because this is not an exceptional case, we review the court's legal rulings for errors of law and its findings of historical fact for any evidence in the record. ORS 19.415(3); *Dept. of Human Services v. N. S.*, 246 Or App 341, 344-45, 265 P3d 792 (2011).

We begin with the question of subject matter jurisdiction. The UCCJEA, ORS 109.701 to 109.834, sets forth the rules for determining jurisdiction in custody cases involving multiple jurisdictions. Under ORS 109.741(1), an Oregon court has jurisdiction to make an initial custody determination if:

"(a)  This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

"(b)  A court of another state does not have jurisdiction under subsection (1)(a) of this section, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under ORS 109.761 or 109.764, and:

"(A)  The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

"(B)  Substantial evidence is available in this state concerning the child's care, protection, training and personal relationships;

"(c)  All courts having jurisdiction under subsection (1)(a) or (b) of this section have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under ORS 109.761 or 109.764; or

"(d)  No court of any other state would have jurisdiction under the criteria specified in subsection (1)(a), (b) or (c) of this section."

A state is the "home state" of a child less than six months old if it is the state in which the child lived from birth. ORS 109.704(7). N in this case was less than six months old when proceedings began; she was born on September 19, 2011, the petition concerning her was filed on December 9, 2011, and the hearing occurred on February 6, 2012. At the time, she had not lived in any state "from birth." Thus,

ORS 109.741(1)(a) does not confer jurisdiction on Oregon or Indiana; N had no home state as that term is defined.

ORS 109.741(1)(b), on the other hand, *does* confer jurisdiction on Oregon because no other state has jurisdiction under paragraph (1)(a) and both subparagraphs (1)(b)(A) and (1)(b)(B) apply. N and mother "have a significant connection with" Oregon beyond mere physical presence. ORS 109.741(1)(b)(A). Although mother testified that she had come to Oregon with N to collect her belongings and that she had intended to return to Indiana and would have done so if DHS had not removed N, the record also shows that mother had lived in Oregon for four years before she returned to Indiana to give birth to N, had received prenatal care in Oregon, and that, in the six weeks that she and N were in Oregon before N was removed from mother's custody, mother applied for and collected public assistance, which requires that the recipient be an Oregon resident. ORS 412.006(1); OAR 461-120-0010. Mother also had multiple contacts with medical professionals in Oregon with regard to her concerns for N's health. Mother and N were living in Oregon and collecting public assistance when N was removed from mother's care on December 9, 2011.

Further, all of the relevant evidence "concerning the child's care, protection, training and personal relationships" was in Oregon: Mother's contacts with health care institutions and professionals, her interactions with DHS, and her erratic conduct. We therefore conclude that, pursuant to ORS 109.741(1)(b), the Oregon court had jurisdiction to make an initial child custody determination for N.

The question on the merits is whether DHS proved by a preponderance of the evidence that N's welfare is endangered because, as alleged:

> "The mother's mental/emotional condition interferes with her ability to parent in that while suffering from a mental/emotional condition the mother is unable and/or unwilling to provide the child with the care, guidance and supervision necessary for the child's physical, mental and emotional well-being."

That standard is met if, "under the totality of the circumstances, there is a reasonable likelihood of harm[.]"

*Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010). We recognize that this is a close case. Had the court's and the agency's concerns involved only mother's idiosyncratic theories of infant nutrition (about the risk of which there was no medical testimony), her distrust of and hostility toward the agency that was, after all, questioning her about her drug use and interfering with her relationship with her infant daughter, *see State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 83, 106 P3d 627 (2005) (hostility toward DHS should not distract from focus on welfare of child in termination proceeding), or her seeking out unnecessary medical care for N, *see State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 312, 121 P3d 702 (2005) (such conduct not sufficient to justify juvenile court asserting jurisdiction), we might well conclude that DHS failed to prove its allegation by a preponderance of the evidence. But this case involves more. In particular, mother's decision to take N out of OHSU before medical personnel cleared her for discharge, her violence and threats against a DHS employee, and her conduct at the hearing as reported by the trial court judge persuade us that mother's mental and emotional health, manifesting itself in a pattern of exaggerated, erratic, and irrational behavior concerning the care of N, shows an inability to properly assess and make decisions concerning N's needs, and gives rise to a reasonable likelihood of a risk of harm to N.

We conclude for that reason that the juvenile court did not err in assuming jurisdiction in this case.

Affirmed.