ORTEGA, P. J.
*111 This is a juvenile dependency case in which father appeals a judgment finding child, his 14-year-old daughter, to be within the jurisdiction of the juvenile court based on findings that father perpetuated domestic violence against mother and that father's substance abuse interfered with his ability to safely parent. Father argues that the juvenile court erred in denying his motion to dismiss and in asserting jurisdiction over child under ORS 419B.100(1)(c) because the Department of Human Services (DHS) failed to prove that either his perpetuation of domestic violence or his use of alcohol created a threat of serious loss or injury to child.
DHS and child cross-appeal, challenging the juvenile court's dismissal of DHS's allegation that father's sexual abuse of child endangers her welfare.[1] DHS argues that, in *1189 light of the juvenile court's explicit finding that father sexually abused child, the juvenile court's dismissal was in error and inconsistent with the undisputed evidence.
In a dependency case, we have discretion to "try the cause anew upon the record or make one or more factual findings anew upon the record." ORS 19.415(3)(b). However, we exercise that discretion only in exceptional cases. ORAP 5.40(8)(c). Here, although none of the parties request de novo review, we view this as an exceptional case for several reasons. First, we conclude that the juvenile court's decision that father does not pose a current risk of sexual abuse to child does not comport with its express factual findings that father sexually abused child and her older sister in the past, or with the uncontroverted evidence in the record that father continued to treat child in a sexualized manner after he stopped sexually abusing her. ORAP 5.40(8)(d)(ii) (a relevant consideration for the appellate court in determining whether to take de novo review is whether the "trial court's decision comports with its express factual findings or with uncontroverted evidence in the record"). Second, the juvenile court made express factual findings, and those express findings allow us to infer the juvenile court's implicit findings *112 as to witness credibility. ORAP 5.40(8)(d)(i) (the appellate court is to consider whether "the trial court made express factual findings, including demeanor-based credibility findings" in deciding whether to take de novo review). Finally, when a juvenile court declines jurisdiction after finding that a parent sexually abused a child, and the court's factual findings related to that determination are ambiguous, de novo review may be justified-and we conclude that it is here-to ensure an expedited resolution to protect the child. See generally ORAP 5.40(8)(d) (stating that the considerations in the rule for reviewing de novo are not binding or exclusive); see also Dept. of Human Services v. T. L. H. S. , 292 Or. App. 708, 715, 425 P.3d 775 (2018) (explaining that the "sole purpose" of juvenile dependency proceedings "is to protect children," and that "[t]he focus is always on the child").
On de novo review, we independently assess and evaluate the evidence and reweigh the facts and reassess the persuasive force of the evidence. Turner and Muller , 237 Or. App. 192, 194, 238 P.3d 1003 (2010), rev. den. , 350 Or. 231, 253 P.3d 1080 (2011). However, "we give considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." Fitts v. Case , 243 Or. App. 543, 552 n. 3, 267 P.3d 160 (2011).
As we explain below, we agree with father that DHS failed to establish a sufficient nexus between father's abuse of alcohol and domestic violence and a nonspeculative risk of serious loss or injury to child and, therefore, we reverse the judgment taking jurisdiction based on those allegations. On the cross-appeal, we agree with DHS and child that the evidence was sufficient to find that father posed a current risk of serious loss or injury to child based on his prior sexual abuse of child and, accordingly, we reverse the juvenile court's ruling rejecting that as a basis for jurisdiction.
Mother and father have been in an intimate relationship for 28 years but they are not married. They have two biological daughters, child, who is 14 years old and a freshman in high school, and child's sister, who is 24 years old and no longer lives in the family home. The parents have separated on and off over the years, but their longest period *113 of separation was the two and a half months preceding the jurisdictional hearing.
On July 31, 2017, while child was present in the house, mother and father got into a verbal altercation. At some point during the altercation, father disclosed to mother (and child overheard) that he had touched child's sister inappropriately. Mother later asked child's sister whether father had touched her, but child's sister would not talk to mother about it. Mother also asked child if father had ever touched her, but child denied that he had. Eventually, child admitted to mother's friend, and later to mother, that father had sexually abused her. After child's disclosure, child's sister finally confirmed to mother that father had sexually abused her as well. Father was arrested on September 1, 2017, based on allegations of sexual abuse against child and child's sister.
About three weeks later, DHS petitioned the juvenile court to take dependency jurisdiction *1190 over child. The petition alleged that (1) father "sexually abused" child, (2) father "perpetrates domestic violence against * * * mother, in the presence of * * * child," and (3) that father's "substance abuse interferes with his ability to safely parent."[2] Mother ultimately admitted to allegations that she "exposed * * * child to domestic violence perpetrated by * * * father" and that her "substance abuse, if left untreated, interferes with her ability to safely parent."[3]
The juvenile court took evidence over two days and heard from a number of witnesses, including child. Child testified that she has been aware of father's drinking her whole life, and that her parents drink half a bottle of whiskey every night. She described seeing her parents drunk every night, and observing them stumbling and slurring their words. However, she stated that "by the time they were drunk, it was mainly about an hour before I would go to bed, so I didn't really have to deal with it." In child's estimation, her parents' drinking had "kind of slowed * * * down" within *114 the past year, but it would also "speed up sometimes." Child testified that father, and sometimes mother, used marijuana, but never around her. Child also stated that father was drinking up until his arrest, but that mother had stopped drinking.
Child also described the parents' fighting. She testified that they would argue "a lot," and that they would also get into fights that involved "pushing and shoving." Child's testimony about how frequently the physical fights occurred was inconsistent, but indicated that the pushing and shoving occurred either once a month or once every other month. Later, child referred to altercations that were sometimes physical between her parents that would occur at night in their bedroom once or twice a week. She described one incident from several years earlier when she heard mother screaming and found that father had mother in a chokehold. He rebuffed child's efforts to get him to let mother go, expressing that mother "need[ed] to learn a lesson." He then grabbed mother's phone and threw it into a wall. Child described another fight to a local agency, Kids First (an investigative agency), in which she witnessed father punching a hole into a wall.
Child also described fights between father and child and between father and child's sister. She testified that "[h]e used to spank me * * * and he always threatened to slap me if I * * * did something wrong * * *." Child described another incident to Kid's First in which father "grabbed [her] hand and held it really, really, really tight." She testified about a recent incident in which father slammed her dog's body and head into the dryer "about seven times." She said that she "grabbed his shirt and ripped it, and screamed, 'Stop!' " Father chased her upstairs, but she escaped and locked herself in her room and did not come out for the rest of the night. She did not know whether father intended to hit her or whether he had been drinking, but she was scared of him that night. She also described an altercation between father and child's sister when child's sister was in high school in which father "ripped" child's sister's door "apart" while child's sister was inside her room "screaming and crying."
*115 Child testified that she was afraid of father and has "always been scared of him." She was also afraid for her and mother's safety. She would try to convince mother to leave father "a lot," but mother never did.
In addition to the domestic violence and substance abuse, child also testified that father sexually abused her when she was seven or eight years old. Father would touch her vagina, which occurred "maybe four" times. Child did not remember exactly when the touching stopped, but she knew it stopped by the time she was in the third or fourth grade, which was around the first time that she had disclosed the abuse to a friend.
Child also described incidents when father would look at her in a sexual way:
"Sometimes it was just looking rather than touching, like, looking while I'd get dressed or looking while I was taking a *1191 shower. He would go in and say, 'Boo,' but he just came in to, like, watch, and he would ask me about the soap and stuff."
Child then went on to describe another incident that occurred in either 2015 or 2016 when she walked out of the bathroom in a towel and into her bedroom to get dressed. When she came back out in her clothes, her father asked to see her in the towel again. She also recalled that, once the touching stopped, "it turned more into talking" and "[w]here he would look at me, and I could see it, you know, when like a guy's checking you out, you can tell."[4]
Child testified that she had never reported the abuse because she "thought it was normal." Child finally disclosed the abuse to mother sometime in the month before father's arrest after she overheard the July 31 fight between her parents in which father admitted touching child's sister inappropriately. When asked how father's touching her had affected her, child responded that she had started cutting herself, which lasted for three years. She admitted that there were other reasons that she would cut herself, but she did not elaborate on what those reasons were. Child also *116 testified that she has had dreams that her father raped her, raped her mother, and raped her friend. She recently started counseling for depression, but said that she did not know whether she was in counseling to talk about the sex abuse.
Child's sister also testified at the hearing. Child's sister moved out of the house when she was 18, but she moved back in with her boyfriend and daughter from October 2016 until January 2017. During that period, she witnessed her parents fighting "three times a week, maybe." She described the fights as "yelling" and "simple marriage bickering that was just loud and vocal." Child's sister did, however, witness a serious altercation where her boyfriend had to step in and stop her father from punching her mother. She indicated that her boyfriend and father were intoxicated at the time.
Child's sister testified that father had also sexually abused her. The sexual abuse had started when she was a freshman in high school, and stopped when she was 17 and a senior. Father would come into her bedroom in the mornings and he would "play with [her] with his finger down below." He finally stopped touching her because she told him "no" and that she wanted it to stop. Child's sister also made father promise that he would never do the same thing to child, but she did not recall ever asking child whether father had touched her. She indicated that she finally disclosed the abuse to mother when she learned that child had disclosed father's abuse and that mother did not believe her.
Mother testified that father has a drinking problem, and also acknowledged that physical fights occurred between her and father when they were both drinking, though she minimized how much child was exposed to physical fights. Mother's acknowledgement of father's sexual abuse was more equivocal, but she did testify that father told her that he had touched child's sister's breast.
DHS caseworker Denney testified about the effects of father's actions on child. Denney opined that, based on meeting child, supervising one visit with mother, reviewing the notes of six or seven other supervised visits, and observing mother's and child's body language, child is very *117 concerned that mother is angry with her. Denney also expressed concern that child "has some anxiety issues around the situation that has come about" and "may be suffering from depression" given that she is "not doing well in school," and is "having a hard time staying committed to things that she's saying that she wants to do." Denney identified a further concern that child might still be cutting herself.
After the presentation of evidence, the juvenile court took jurisdiction as to father based on its finding that DHS had met its burden to prove by a preponderance of the evidence that father perpetuates domestic violence against mother and that his substance abuse interferes with his ability to safely parent.[5] The juvenile court dismissed the remaining *1192 jurisdictional allegations against father, including the allegation that father sexually abused child.
With regard to the domestic violence and substance abuse allegations, the juvenile court made few express findings other than to note that the evidence was sufficient to prove the allegations and that there was a present risk of harm. In dismissing the sexual abuse allegation, the court made these findings:
"[T]here's not really any dispute about the daughters acknowledging and admitting that there was sexual abuse at some time in the past.
"The problem is, * * * I don't have any evidence or testimony that there's a present-day risk * * * of that conduct occurring in a * * * non-speculative way if the Court didn't intervene today."
The juvenile court later continued,
"I do think that abuse that's admittedly occurred at age seven, possibly eight, that hasn't repeated itself, and the [c]hild's now fourteen, a freshman in high school, I think that you still have to prove there's some current-day risk. And I don't think that [DHS has] met that burden by a preponderance of the evidence."
Under ORS 419B.100(1)(c), jurisdiction is warranted if a child's "condition or circumstances are such as *118 to endanger [her] welfare"-that is, if they "give rise to a threat of serious loss or injury." Dept. of Human Services v. A. F. , 243 Or. App. 379, 386, 259 P.3d 957 (2011). "DHS has the burden to establish a nexus between the allegedly risk-causing conduct or circumstances and risk of harm to the child," Dept. of Human Services v. E. M. , 264 Or. App. 76, 81, 331 P.3d 1054 (2014) (citing Dept. of Human Services v. M. Q. , 253 Or. App. 776, 785, 292 P.3d 616 (2012) ), and must do so by a preponderance of the evidence, Dept. of Human Services v. S. C. S. , 253 Or. App. 319, 325, 290 P.3d 903 (2012), rev. den. , 353 Or. 428, 299 P.3d 889 (2013). The risk of harm must be "present at the time of the hearing and not merely speculative," E. M. , 264 Or. App. at 81, 331 P.3d 1054, and DHS must present evidence of the "type, degree, and duration of the harm" to the child, Dept. of Human Services v. S. D. I. , 259 Or. App. 116, 121, 312 P.3d 608 (2013).
Because we conclude that sexual abuse is the only basis for jurisdiction as to father that is supported on this record, we begin with the cross-appeal. DHS and child contend that the evidence was sufficient to establish that father posed a current risk of harm to child for a number of reasons. First, they argue, the juvenile court expressly found that father had sexually abused child and child's sister. Second, even though father had not sexually abused child in several years, child was the same age as child's sister was when father began sexually abusing child's sister. Third, there was evidence that father continued to treat child in a sexualized manner, including asking to see her naked and making inappropriate sexual comments. Fourth, father had not completed any sex offender treatment. Lastly, as a result of father's sexual abuse in the past, child began cutting herself and continues to suffer from anxiety and depression.
Father responds that a finding that he sexually abused child and child's sister years before the jurisdictional hearing did not establish a risk that he would sexually abuse child in the future. Father further contends that the juvenile court did not have to credit evidence that he continued to treat child in a sexualized manner or that doing so exposed her to serious loss or injury. He also contends *119 that the court could have concluded that child's anxiety and depression, if any, was not related to sexual abuse by father.[6] As discussed below, we agree with DHS and child that child faces a present risk of harm from sexual abuse by father.
First, we find that DHS proved by a preponderance of the evidence that father sexually abused child and child's sister. Child and child's sister testified to details of the sexual abuse, and that evidence was uncontroverted. The juvenile court implicitly found *1193 both child and child's sister to be credible, and we defer to that credibility finding. See Fitts , 243 Or. App. at 552 n. 3, 267 P.3d 160 (on de novo review, we give great weight to trial court's findings on the credibility of witnesses). Additionally, father admitted to mother that he touched child's sister inappropriately.
Unlike the juvenile court, however, we conclude that DHS established a current threat of harm by a preponderance of the evidence. A person's status as a sex offender does not alone justify state intervention, nor does the fact that a sex offender is untreated create a presumption of risk to the child. See Dept. of Human Services v. G. J. R. , 254 Or. App. 436, 445, 295 P.3d 672 (2013) (concluding that there was insufficient evidence of risk to the child where the father had not reoffended in 10 years and where the child was not in the class of the father's victims). In this case, however, there is evidence that father sexually abused child herself four times and there is no evidence that he engaged in treatment or acknowledged the harm to child. Moreover, even after the abuse stopped, father continued to say sexually inappropriate things to child and to regard her in a sexual way. Additionally, there is evidence that father sexually abused child's sister when she was the same age as child is now, supporting a concern that child continues to be in the class of father's victims. For all of those reasons, we conclude that father's past sexual abuse of child poses a current risk of harm to child, and reverse the judgment dismissing that allegation.
*120 We turn to father's appeal. Father argues that, even if he was engaging in alcohol abuse and domestic violence, DHS failed to prove a nexus between that conduct and a nonspeculative risk of serious loss or injury to child. He points to a lack of evidence that child was injured during any incidents of pushing and shoving between the parents or that perceiving those incidents put child at risk of any serious loss or injury, and further emphasizes that child did not attribute her cutting behavior to father's drinking or domestic violence and that there was no other evidence linking those things. Finally, father argues that the evidence was insufficient to establish that child was suffering from anxiety or depression at all.
DHS responds that father's drinking and domestic violence are intertwined and that father's substance abuse created a risk of harm to child because it contributed to the domestic violence. DHS emphasizes some of the worst incidents in which child tried to intervene and notes that child is scared of father and suffers from anxiety and depression and that father has not engaged in domestic violence services.
Like the juvenile court, we find that father perpetuated domestic violence against mother; indeed, the parents at trial disputed only the severity and frequency of the violence between them, which is not determinative in this case. We also find that child was exposed to domestic violence, based on child's testimony that she frequently hears and sees physical fights between her parents and her description of incidents when she observed father's aggressive behavior. Further, like the juvenile court, we find ample support in the record that father abuses alcohol. However, the evidence in the record does not persuade us that either of those problems presents a current risk of serious loss or injury to child, nor does it establish a nexus between those problems and any perceived harm, sufficient to support juvenile court jurisdiction.
As we have previously explained, "[e]vidence that a child has been exposed to a parent exhibiting the adverse effects of intoxication is not, in and of itself, a basis for juvenile court jurisdiction."
*121 Dept. of Human Services v. D. S. F ., 246 Or. App. 302, 314, 266 P.3d 116 (2011). Likewise, a child's exposure to domestic violence does not necessarily create a risk of serious loss or injury to a child sufficient to warrant juvenile court intervention. See Dept. of Human Services v. K. C. F. , 282 Or. App. 12, 20, 383 P.3d 931 (2016) (reversing the juvenile court's assumption of jurisdiction where DHS presented evidence that the children were exposed to and affected by the father's emotional abuse of the mother, but the record lacked evidence of a present risk of serious harm to them). "[T]he state must establish both that the child is at risk of a certain severity of harm and that there is a reasonable likelihood that" the risk will occur. S. D. I ., 259 Or. App. at 121, 312 P.3d 608.
*1194 Here, DHS presented no evidence that father's drinking alone created a risk of harm to child. Rather, DHS argues that father's drinking contributed to the domestic violence and that the domestic violence created a nonspeculative risk of harm to child. However, even assuming, without deciding, that a connection between drinking and domestic violence has been established, the evidence does not persuade us that there is a serious risk of harm sufficient to support juvenile court intervention.
We have found a risk of physical harm to a child as a result of proximity to domestic violence where the record contains evidence specific to that child to support such a finding. See , e.g. , Dept. of Human Services v. C. M., 284 Or. App. 521, 523, 525-30, 392 P.3d 820 (2017) (where the evidence included testimony about the four-year-old child's physical proximity to violence on a particular occasion that could have, but did not, result in injury to the child, and caseworker testimony establishing how such injuries can occur). Here, however, the evidence was insufficient to support such a finding. Child testified that her parents "pushed and shoved" each other once a month or once every other month, but the record does not establish child's proximity to the pushing and shoving or establish how she was put at physical risk, if she was. Indeed, child testified about many occasions when she was in her bedroom and overheard the fights but was physically out of harm's way. There is evidence that child observed father choking mother when child *122 was nine years old, and that she observed father punch a hole in the wall, but there was no further evidence of how child was at physical risk during those incidents.
Moreover, there is no evidence that father injured or assaulted child during her parents' fights. Child testified that father would spank her or threaten to slap her, and that he grabbed her hand tight one time, but such conduct, although far from ideal, does not establish a risk of injury to child sufficient to support jurisdiction. Likewise, aggressive behavior such as slamming child's dog's head into the dryer and "ripping" child's sister's door apart is alarming, but does not establish a serious risk of physical harm to child. Although it may be that a record of such a risk could be made in a case such as this one, without evidence of an actual assault of the child, by means of other evidence establishing how the child was put at physical risk, such a record was not made in this case.
DHS also asserts that child is at risk of psychological harm because child suffers from depression and anxiety and was harming herself. However, DHS presented scant evidence of the "type, degree, and duration" of the emotional harm. See K. C. F. , 282 Or. App. at 20, 383 P.3d 931 (finding that, although DHS presented evidence that father was emotionally abusive and that the conflict between the parents affected the children, DHS failed to present sufficient evidence about the "type, degree, and duration of harm necessary to establish a threat of serious loss or injury"). The only evidence in the record that child suffers from depression and anxiety derives from the DHS caseworker who testified that she was "concerned that [child] has some anxiety issues around the situation that has come about, as well as she may be suffering from depression." Child did not (and indeed could not be expected to) make that connection, and Denney's "concern" about signs of anxiety and depression based on her own limited observations of child was insufficient to fill the gap. Cf. S. D. I. , 259 Or. App. at 119, 123, 312 P.3d 608 (concluding that a DHS caseworker's testimony that child would " 'likely' " suffer from psychological damage if transferred to the care of her mother was not sufficient evidence to establish the severity of the harm to support jurisdiction). Although we take seriously child's expressed fear of father, that fear alone likewise *123 is not sufficient to support dependency jurisdiction. See, e.g. , State ex rel Dept. of Human Services v. D. T. C. , 231 Or. App. 544, 554, 219 P.3d 610 (2009) (although the father's behavior while he was drinking frightened the children and was "not ideal parenting," the record was insufficient to support dependency jurisdiction).
Even assuming the evidence was sufficient to establish a risk of serious harm to child, DHS failed to establish, on this record, a nexus between the depression, anxiety or cutting and father's domestic violence and drinking. Denney testified that she believed child was suffering from depression, but she *1195 did provide any information about the cause of that depression. Additionally, Denney testified that child "has some anxiety issues around the situation that has come about," which is general and ambiguous and not sufficient evidence that the anxiety was caused by father's drinking or the domestic violence in the home. Although that might be the case, the "situation" that was causing child anxiety also could have been the intervention of DHS in child's home life, the juvenile dependency proceedings, or that father was incarcerated and facing serious criminal charges as a result of the sexual abuse allegations. Denney also testified that child had self-harmed at some point in the past, but she did not testify that she had any information about why child was self-harming. Child testified that the sexual abuse caused her to self-harm. Child did state that there were reasons other than the sex abuse that lead her to self-harm, but child did not specify what those reasons were. DHS presented no evidence that father's perpetuation of domestic violence and substance abuse issues were correlated to child's self-harming behavior or any depression and anxiety child may have been suffering.
We do not mean to suggest that a record of a serious risk of harm to a child from prolonged exposure to abuse of alcohol and domestic violence could not be made under these circumstances. See Dept. of Human Services v. J. H. , 292 Or. App. 733, 741-42, 425 P.3d 791 (2018) (recognizing that, even in the absence of physical violence, exposure to frequent and severe verbal altercations between parents or other adults in a child's home may cause or risk serious emotional or psychological harm to the child). However, we have repeatedly *124 recognized that bad parenting alone does not justify state intervention. See Dept. of Human Services v. R. L. F. , 260 Or. App. 166, 172, 316 P.3d 424 (2013) (quoting A. F. , 243 Or. App. at 387, 259 P.3d 957 ) (noting that "[w]hen evaluating whether a parent's alleged behavior may cause harm to the child sufficient to support dependency jurisdiction, we must consider that '[t]he fact that a parent engages in behavior that could negatively affect his or her parenting does not necessarily mean that the behavior can serve as a basis for juvenile court jurisdiction over a child.' "). On de novo review, the evidence does not persuade us that there is a nonspeculative and serious risk of harm to child from exposure to father's domestic violence and abuse of alcohol. Accordingly, the juvenile court's exercise of jurisdiction on those bases was in error.
The judgment of the juvenile court dismissing the sexual abuse allegation as to father is reversed and remanded, and the judgment finding jurisdiction based on father's substance abuse and domestic violence is also reversed.
On appeal, reversed; on cross-appeal, reversed and remanded.

Child adopts DHS's answering brief and DHS's opening brief on cross-appeal. Therefore, when referring to DHS's arguments made on appeal, we are necessarily including child's arguments on appeal.

The petition also alleged that "father's mental health condition interferes with his ability to safely parent" and that "father's criminal behaviors and attendant consequences interfere with his ability to safely parent." The juvenile court dismissed those claims, and DHS and child do not appeal that ruling.

Mother is not a party to this appeal.

She distinguished those incidents from the times he would go into the bathroom when she was in the shower, which she said "he didn't do * * * anymore."

The juvenile court's determinations as to mother are not before us.

Father asserts that DHS failed to preserve its arguments that evidence that he treated child in a sexualized way and that child suffered psychological harm from his conduct established a current risk of harm. We reject those arguments as to preservation without further written discussion.