Argued and submitted December 9, 2019; reversed and remanded as to portion of judgment ordering out-of-home placement of T, otherwise affirmed March 4, 2020

In the Matter of T. J. II,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. J.,
*Appellant.*

Klamath County Circuit Court
19JU03693; A171753

462 P3d 315

The Indian Child Welfare Act applies to this dependency case, in which the juvenile court asserted jurisdiction over child, T, and placed T in foster care after father assaulted mother and mother minimized the domestic violence. Only father appeals, challenging the jurisdictional basis as to him and the out-of-home placement of T. *Held*: The juvenile court did not err in taking jurisdiction on the basis of father's domestic violence. However, the evidence was insufficient for the juvenile court to conclude that mother's continued custody of T, despite her minimization of father's domestic violence, was "likely to result in serious emotional or physical damage" to T. 25 USC § 1912(e).

Reversed and remanded as to portion of judgment ordering out-of-home placement of T; otherwise affirmed.

Roxanne B. Osborne, Judge.

Ginger Fitch argued the cause and filed the briefs for appellant.

Kirsten M. Naito, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

ORTEGA, P. J.

Reversed and remanded as to portion of judgment ordering out-of-home placement of T; otherwise affirmed.

**ORTEGA, P. J.**

The Indian Child Welfare Act (ICWA), 25 USC §§ 1901 - 1963 (1978), applies to this juvenile dependency case, in which infant child, T, was removed by the Department of Human Services (DHS) after father was arrested for assaulting mother. The juvenile court subsequently asserted dependency jurisdiction as to both parents;[1] found that DHS had made "active efforts" to prevent breakup of the family; and, ultimately, placed T in foster care.[2] Father now seeks reversal of the combined jurisdictional/dispositional judgment, challenging the jurisdictional basis as to him and the out-of-home placement of T. We conclude that the juvenile court did not err in taking jurisdiction on the basis of father's domestic violence against mother. We agree with father, however, that the evidence was insufficient for the juvenile court to conclude that mother's continued custody of T, despite her minimization of father's domestic violence, was likely to result in serious emotional or physical damage to T. Accordingly, we affirm the portion of the judgment asserting jurisdiction over T but reverse the portion of the judgment ordering T to be placed out of mother's home.[3]

*De novo* review is neither requested nor warranted. *See* ORAP 5.40(8)(c) (only in "exceptional cases" will we

---

[1] Generally, "the juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and *** [w]hose condition or circumstances are such as to endanger the welfare of the person or of others[.]" ORS 419B.100(1)(c).

[2] ICWA provides, in relevant part:

"(d) Any party seeking to effect a foster care placement of *** an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

"(e) No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

25 USC § 1912(d) - (e). Oregon's statutory counterpart, ORS 419B.340(7), is substantially similar. *See also* 25 CFR § 23.120; 25 CFR § 23.121(a); OAR 413-115-0060; OAR 413-115-0130(1)(a).

[3] Given our disposition, we do not address father's second assignment of error—that the juvenile court's failure to describe DHS's active preventive and reunification efforts in the judgment warrants reversal.

exercise our discretion to try the cause anew). As such, we review the jurisdictional and dispositional outcomes below for legal error, viewing the evidence in the light most favorable to the juvenile court's determinations and assuming the correctness of that court's explicit factual findings if any evidence in the record supports them. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013); *see also Dept. of Human Services v. J. F. D.*, 255 Or App 742, 744, 298 P3d 653 (2013) ("We review findings of fact \*\*\* for any evidence, and conclusions of law \*\*\* for legal error."). We state the facts consistently with those standards.

Mother became pregnant with T soon after beginning her relationship with father. T is eligible to enroll in the Klamath Tribes (the Tribes) through father's membership; therefore, ICWA applies. *See* ORS 419B.878 (applicability of ICWA); 25 USC § 1903(4) (definition of "Indian child"). At the time of the incident giving rise to this matter, T was four months old and living with mother and four maternal half-siblings, who ranged in age from two to five years. Since T's birth, father had regularly stayed at mother's apartment to help care for the children.

On the consequential night in May 2019, both parents drank heavily and began arguing; the recent suicide of father's sister and the burden of caring for all the children had strained their relationship. Mother's two oldest children were awakened by the commotion in the small apartment and witnessed father pulling mother's hair and striking her face and head, causing a one-inch bleeding laceration for which mother received staples. Father also attempted to punch the five-year-old child, but mother intervened, and he knocked down the television and broke a window. Police arrived to find the apartment in "general disarray," with "stuff \*\*\* scattered around," including broken glass, blinds, and picture frames. The other children, including T, were asleep in a bedroom during the incident.

Father, who was under post-prison supervision, left before police arrived, but he was soon arrested and observed to have abrasions on his knuckles. Father eventually entered a no-contest plea and was convicted of fourth-degree assault constituting domestic violence, ORS 163.160, resulting in a

12-month bench probation sentence and an order to refrain from all nonpreapproved contact with mother. Father had prior convictions for alcohol-fueled assaults, but this was his first involving domestic violence.

DHS caseworker Grant Laugsand interviewed mother several times in the five days following the incident. Initially, mother denied that father had attacked her, stating instead that a random stranger had injured her and damaged the apartment. She expressed that she needed father back home to help care for the children. In later conversations, mother admitted that father had injured her and that they had known that "things were coming to a head" with their recent heavy drinking. During a follow-up interview, however, mother again equivocated, professing that she had been too intoxicated to remember much, but she was adamant that none of her children had witnessed or been involved in the incident. Concerned about mother's denial of father's domestic violence and minimization of the threat of harm to her children, DHS removed all of the children, placing the three oldest together in relative foster care, and the second youngest and T together in nonrelative foster care.[4]

DHS petitioned the juvenile court to take jurisdiction over T, alleging, as to father, that his domestic violence against mother while T was in the residence and failure to successfully engage in treatment to address that conduct presented a threat of harm to T. As to mother, DHS sought jurisdiction based on her domestic violence against father while T was in the residence and her failure to successfully engage in treatment to address that conduct; her belief that father does not pose a risk to T; and her lack of understanding of T's needs and lack of skills to adequately and appropriately parent and protect T.

The juvenile court held a combined jurisdictional and dispositional hearing in June 2019. Father, who admitted that his memory of the incident was "fuzzy" because he had drunk heavily that day, testified that the argument had been outside and only verbal. He denied beating mother or attempting to punch her five-year-old, stating that he was

---

[4] Neither mother nor the other children are involved in this appeal.

not someone who hits his partner or children; therefore, father asserted, ordering him to participate in domestic violence classes was "not suitable." Father asserted that he had pleaded no-contest to the assault charge under threat that, otherwise, mother would also be jailed, leaving the children with no caretaker. Nevertheless, father had abided by the no-contact order and intended to do so as long as the order remained in effect. He stated, "I don't want [T] to come to me; I want him to go home to his mom. * * * And if I've got to stay away and I've got to do what I've got to do, that's what I'm going to do but I don't want [mother] to suffer for what I've done[.]"

According to Andrea Witcraft, father's therapist, father had independently sought mental health and substance abuse counseling at Youth & Family Guidance Center in December 2018 and had remained engaged in services until his sister died in April 2019, precipitating his relapse into alcohol use. After the May incident, father had immediately and voluntarily reengaged with the center to address issues of anxiety, anger management, childhood trauma from being in foster care, and grief and loss. At the time of the hearing, father had maintained sobriety for about 45 days, essentially since the day of the incident; had attended sessions consistently; was scheduled to discuss taking Naltrexone, a medication that causes "really bad side effects" in alcohol users; and was going to participate in the Positive Indian Parenting retreat and explore other parenting resources. Witcraft opined that father had "an excellent prognosis" and had been going "above and beyond to address his issues."

Mother also testified, maintaining that she did not recall who had attacked her and damaged the apartment or that any of the children had been outside of their bedroom. However, she acknowledged that father poses a risk to the children when he drinks. She maintained that her relationship with father was over and that their last contact had been on the night of the incident. Because father was abiding by the no-contact order, she felt no need to obtain a restraining order (as she had against a different abusive partner), but she did not rule out the possibility of doing so should the need arise. Mother's daily regimen

since the children's removal involved visits with them and engagement in services to address substance abuse (including recovery intervention and relapse prevention), anger management, mental health services, and parenting skills support (including a nonoffending parenting course about avoiding people who pose threats to one's self or children). At the time of the hearing, mother had maintained sobriety for 30 days. She had also communicated with her landlord and family members to ensure that her housing was secure, bills were settled, and childcare support was available. Mother stressed that the children's safety would always come before her relationship with father or the first drink.

Laugsand opined that the children were under a threat of harm from domestic violence because they were in close proximity to the violence and because violence "can have a lasting and harmful effect" on children who observe it. When asked about DHS's efforts toward keeping the children with mother, Laugsand explained that mother's denial of father's violence and her expressed desire for father to return home "kind of prevented it because we had a mother that wasn't necessarily being cooperative with the agency in regards to the identified safety concern." He expressed that DHS was "concerned that if we tried to put some type of service provider in the home that mother would not be acting safely with the children or even with the safety provider there." Laugsand had attempted to identify appropriate relative placement resources for T but had been unsuccessful.

Tribal expert witness Candi Usesarrow testified that DHS had made active efforts to prevent breakup of the family; that T's current foster care placement was in his best interests; and that the Tribes' support for T's return to mother was contingent on provider recommendations that the home is clean and substance- and violence-free.[5]

In closing, father argued against jurisdiction, reasoning that because both parents were abiding by the no-contact order and there had been only one incident of domestic violence, no reasonable likelihood of a threat of

---

[5] Usesarrow was the Children and Family Program Manager for the Tribes, and she oversaw T's case while the tribal caseworker who actually handled the case was on vacation.

harm to T existed. Even if the court took jurisdiction, father argued, T should be returned to mother.

The juvenile court disagreed that jurisdiction was inappropriate:

> "Okay, so the guy has got a [second-degree assault] conviction ***, goes ahead and drinks even though he's on post-prison supervision, gets in some big gigantic problem that [the children] for sure witnessed, and there's no likelihood that anything bad is going to happen in the future?"

Then, in explaining why it was ordering mother to undergo a psychological evaluation, the court discredited mother's testimony regarding the incident: "I do not believe that you don't remember and the fact that your two little kids witnessed what's going on, you've got a problem." Furthermore, the court specified that mother's minimization of the domestic violence was the reason why it was not returning the children to her:

> "Because she was under the influence of alcohol, you guys got in a big, gigantic, scary fight, destroyed property, and she then said there was no problem and that you should be able to come home. And that's not right. No. It's her responsibility to protect her children from domestic violence situations."

Ultimately, the court took jurisdiction over T as to both parents based on the alleged grounds.

Only father appeals, contesting the sufficiency of the evidence supporting (1) the juvenile court's assertion of jurisdiction as to him and (2) the court's order that T be placed in foster care rather than returned home to mother.

We first address the threshold issue of jurisdiction. "Under ORS 419B.100(1)(c), jurisdiction is warranted if a child's 'condition or circumstances are such as to endanger [that child's] welfare'—that is, if they 'give rise to a threat of serious loss or injury.'" *Dept. of Human Services v. D. W. M.*, 296 Or App 109, 117-18, 437 P3d 1186 (2019) (citation omitted). DHS must prove that the threat is current, nonspeculative, and causally connected to the allegedly risk-causing conduct or circumstances. *Id.* at 118. Father asserts that DHS must meet its burden by clear and convincing evidence,

which is the heightened standard required in ICWA cases before a child may be placed in foster care. *See* 25 USC § 1912(e). DHS, on the other hand, contends that the lower standard of a preponderance of the evidence suffices for establishing jurisdiction.

Father primarily relies on *D. W. M.*, a non-ICWA case in which we applied the preponderance standard and concluded on *de novo* review that the juvenile court erred in taking jurisdiction based on the father's domestic violence. 296 Or App at 112.[6] Father posits that the facts in *D. W. M.* are comparable to or even more egregious than those present in this case; therefore, it follows from prior case law that the evidence here was insufficient to meet the more stringent clear-and-convincing standard. The evidence in *D. W. M.* included that the parents would push and shove each other; the father would spank or threaten to slap the teenage child and had once grabbed her hand tightly; and the father would behave aggressively, such as by "slamming" a dog's head into the dryer and "ripping" a door apart. *Id.* at 121-22. We described the father's conduct as "alarming" but ultimately determined that, without more—for example, evidence of the child's proximity to the incidents or of an actual assault of the child—the record did not establish a serious risk of physical harm to the child. *Id.* In addition to relying on *D. W. M.*, father argues that the risk of harm to T was speculative—there was only a single incident of domestic violence, and T did not even observe it—and not current, given that at the time of the hearing, both parents were engaged in services, maintaining sobriety, and abiding by the no-contact order.

Assuming without deciding that ICWA requires the jurisdictional allegations to be proved by clear and convincing evidence, we conclude that the record was sufficient for the juvenile court to assert jurisdiction based on a nonspeculative and current risk of harm to T from father's domestic violence. A child need not be "physically harmed [by] or even aware of" the domestic violence surrounding the child to be

---

[6] We also determined that the juvenile court erred in taking jurisdiction based on the father's substance abuse and in dismissing allegations of the father's sexual abuse of the child, which *would* have been a proper jurisdictional basis. *D. W. M.*, 296 Or App at 124.

at risk. *Dept. of Human Services v. C. M.*, 284 Or App 521, 529, 392 P3d 820 (2017) (citations omitted). Unlike the teenage child involved in *D. W. M.*, T was a more vulnerable four-month-old infant. Although T was asleep in another room, had the altercation escalated and spilled into his area of the small apartment, he would have had no ability to protect himself, nor would either parent have been in the right state of mind to consider his safety. Indeed, both parents testified that they had been so intoxicated that night that they could not recall the most significant moments.

Additionally, although this was father's first incident of domestic violence, and despite his recent return to sobriety, his history of alcohol-fueled violence and indiscretion raised the risk of harm to T above pure speculation. Perhaps most significantly, at the hearing father continued to deny that he had assaulted mother, attempted to punch her five-year-old child, and damaged the apartment, and he opposed being ordered to participate in domestic violence classes. Given father's unwillingness to account for and address the conduct that triggered the dependency proceeding, the risk of harm to T was current at the time of the hearing. *See Dept. of Human Services v. K. C. F.*, 282 Or App 12, 19, 383 P3d 931 (2016) ("Domestic violence between parents poses a threat to children when it creates a harmful environment for the children and the offending parent has not participated in remedial services or changed his or her threatening behavior."). Based on the foregoing, we are persuaded that the evidence was sufficiently clear and convincing to support dependency jurisdiction on the basis of father's domestic violence against mother.

We turn next to the issue of T's out-of-home placement. Under ICWA,

"[n]o foster care placement may be ordered *** in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

25 USC § 1912(e). "[T]he evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result

in serious emotional or physical damage" to the child. 25 CFR § 23.121(c). Neither party disputes that the juvenile court effected a foster care placement or that Usesarrow was a qualified expert witness for ICWA purposes. At issue is whether DHS proved by clear and convincing evidence that the continued custody of T by mother—the jurisdictional bases as to whom are unchallenged—was likely to result in serious emotional or physical damage to T. Father repeats the arguments that he advanced as to the jurisdictional issue, namely, that the risk of harm to T was speculative and not current. DHS counters that mother's failure "to acknowledge the seriousness of the domestic violence incident" and her "history of abusive partners" were sufficient to support the juvenile court's conclusion that T would suffer serious emotional or physical damage if he were returned to her custody. On this issue, we agree with father.

Even though the juvenile court determined that mother was not credible in testifying that she could not recall the identity of her attacker, that credibility determination does not support a nonspeculative inference that serious emotional or physical damage to T would likely result if he were returned to mother, especially given that father was out of the home and both parents were abiding by the no-contact order. Mother's minimization of domestic violence in an attempt to protect father does not necessarily equate to her inability or unwillingness to protect T. *Compare Dept. of Human Services v. M. Q.*, 253 Or App 776, 786, 292 P3d 616 (2012) ("[T]he juvenile court's apparent disbelief of father's claimed sobriety is not affirmative evidence that he still was using drugs at the time of the 2012 hearing." (Citations omitted.)). Furthermore, although mother initially stated that she wanted father to return home despite his domestic violence, it appears from the record that she last expressed that wish five days after the incident—that is, 40 days before the jurisdictional/dispositional hearing. The record lacks any evidence to suggest that after that time DHS talked to mother again regarding her view of father—or, indeed, that DHS contacted mother at all. At the hearing itself, mother stated that she and father had not been in contact since the incident, that their relationship was over, and that father poses a risk to the children when he drinks. Based on the

foregoing, to infer that, at the time of the hearing, mother continued to want father to return home is to speculate, and to conclude further—that mother would violate a no-contact order to make that happen, such that serious emotional or physical damage to T would likely result—is to make an inferential leap that is unsupported by the clear and convincing evidence that ICWA requires.

Moreover, contrary to DHS's assertion that mother has a "history of abusive partners," the record establishes the existence of only one, the father of her other children, and mother obtained a restraining order against him and left with the children. Rather than an inability to protect, that history demonstrates mother's ability and willingness to protect her children from abuse.

Additionally, the record indicates that mother was participating in programs to address substance abuse, anger management, mental health, and parenting skills; had maintained sobriety for 30 days; and had communicated with her landlord and family members to ensure that her housing was secure, her bills were paid, and childcare was available. That evidence undercuts the view that placing T with mother was likely to result in serious emotional or physical damage to the child.

Finally, Usesarrow's testimony likewise fails to establish clear and convincing evidence of the requisite danger to T should he be returned to mother's custody. The tribal expert witness offered only conclusory assertions as to the ultimate issues rather than evidence regarding the specific circumstances of the family that posed a danger.[7]

---

[7] The interpretative guidelines issued by the Bureau of Indian Affairs (BIA), although lacking in binding legislative effect, are instructive to our understanding of ICWA's requirements. *Quinn v. Walters*, 320 Or 233, 260, 881 P2d 795 (1994). The current version of the guidelines issued in 2016. U. S. Dept. of the Interior, Bureau of Indian Affairs, *Guidelines for Implementing the Indian Child Welfare Act* (Dec 2016), https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf (2016 BIA Guidelines). The guidelines recommend

"that the qualified expert witness be someone familiar with [the] particular child. If the expert makes contact with the parents, observes interactions between the parent(s) and child, and meets with extended family members in the child's life, the expert will be able to provide a more complete picture to the court."

2016 BIA Guidelines § G.2 at 55.

In sum, the juvenile court properly exercised jurisdiction over T—because the jurisdictional basis related to father is not erroneous, for the reasons discussed, and because the jurisdictional bases related to mother are unchallenged. However, the court erred in ordering an out-of-home placement for T, because DHS failed to prove by "clear and convincing evidence" that returning T to mother, even though she has not challenged the jurisdictional bases as to herself, was "likely to result in serious emotional or physical damage" to T. 25 USC § 1912(e).

Reversed and remanded as to portion of judgment ordering out-of-home placement of T; otherwise affirmed.